**2026 WI 27**

# Supreme Court of Wisconsin



WISCONSIN VOTER ALLIANCE, et al.,
*Petitioners-Appellants-Petitioners*,

*v.*

KRISTINA SECORD,
*Respondent-Respondent*.

No. 2023AP36
Decided July 7, 2026

REVIEW of a decision of the Court of Appeals
Walworth County Circuit Court (David W. Paulson, J.)
No. 2022CV443

JANET C. PROTASIEWICZ, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and REBECCA FRANK DALLET, BRIAN K. HAGEDORN, and SUSAN M. CRAWFORD, JJ., joined. ANNETTE KINGSLAND ZIEGLER, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined.

¶1 JANET C. PROTASIEWICZ, J. The Wisconsin Voter Alliance[1] seeks access to Notice of Voting Eligibility forms ("NVE forms") under Wisconsin public records law. Courts use NVE forms to communicate to election officials or agencies that a person subject to guardianship

---

[1] We refer to Petitioners Wisconsin Voter Alliance and its president, Ron Heuer, as "the Alliance."

proceedings has been found incompetent to vote. The Alliance filed a public records request with the Walworth County register in probate and brought this mandamus action seeking disclosure of completed NVE forms. The circuit court held that the forms should not be released, and the court of appeals, on remand from this court, affirmed.

¶2    Our decision today is rooted in the legislature's choice to protect the privacy of individuals subject to guardianship proceedings. The legislature said, with limited exceptions, "court records pertinent to the finding of incompetency are closed." WIS. STAT. § 54.75 (2021–22).[2] We hold that the NVE forms at issue here are "closed" under that statute. Thus, the Alliance does not have a right to the forms under our public records law, and the Alliance is not entitled to a writ of mandamus. We affirm the court of appeals.

## I.  BACKGROUND

### A.  NOTICE OF VOTING ELIGIBILITY FORMS

¶3    To provide background for the Alliance's public records request, we begin with an explanation of chapter 54 guardianship proceedings and the role of NVE forms. Under chapter 54, a court may receive a petition for guardianship and hold a hearing to assess an individual's competency. *See* WIS. STAT. §§ 54.34, 54.44. Such hearings "shall be closed" to the public. § 54.44(5). After holding a hearing, the court may find that the person is incompetent and may appoint a guardian. *See* WIS. STAT. §§ 54.10(3), 54.46(2).

¶4    Additionally, a "court may, as part of a proceeding under s. 54.44 in which an individual is found incompetent and a guardian is appointed, declare that the individual has incapacity to exercise" certain rights. WIS. STAT. § 54.25(2)(c)1. One such right is the "right to register to vote or to vote in an election." § 54.25(2)(c)1.g. A court may determine that an individual is ineligible to vote if "the court finds that the individual is incapable of understanding the objective of the elective process." *Id.* When the court makes such a voter-eligibility finding, the determination "shall be communicated in writing by the clerk of court." *Id.* The clerk of court

---

[2] All subsequent references to the Wisconsin Statutes are to the 2021–22 version unless otherwise indicated.

must send that communication to officials or agencies that are "responsib[le] for determining challenges to registration and voting." *Id.* Similarly, if a chapter 54 court later reviews its voter-eligibility finding upon a petition for restoration of rights, the "subsequent determination of the court shall be likewise communicated by the clerk of court." *Id.* (referencing WIS. STAT. § 54.64(2)).

¶5 Courts use NVE forms to make those communications. Courts, via registers in probate, transmit the forms to local election officials and to the Wisconsin Elections Commission ("WEC"), which maintains an official list of registered voters. *See* WIS. STAT. § 6.36(1)(a). The NVE forms are standardized circuit court forms, numbered GN-3180.[3]

¶6 An NVE form contains information about the chapter 54 proceeding, the individual found incompetent, and the finding of incompetency to vote. The form lists the county, case caption, and case number for the guardianship proceeding. It displays the subject individual's name and date of birth, and may display the individual's address. The substance of the form communicates one of two check-the-box findings. It indicates that "[t]he circuit court declared on [a specified date] that" the individual either "is not competent to exercise the right to register to vote or to vote in an election" or "has been restored the right to register to vote and to vote in an election." It also contains a "For Official Use Only" box for WEC staff. At the bottom, the form lists two statutes, "§§ 54.25(2)(c)(1)(g) and 54.64(2)." The form is signed by the register in probate.

### B. THE ALLIANCE'S REQUEST AND PROCEDURAL HISTORY

¶7 The Alliance seeks to identify individuals who have been found incompetent to vote. It sent public records requests to registers in probate across the state. Here, we consider a request that the Alliance sent to the register in probate of Walworth County, Kristina Secord.

¶8 The Alliance sent two requests to Secord, one on June 28, 2022, and a second about a month later, on July 26, 2022. In those requests,

---

[3] While many circuit court forms are publicly available on the court system website, GN-3180 forms are not. *See Circuit Court Forms*, WIS. CT. SYS., https://www.wicourts.gov/forms (last visited June 18, 2026).

the Alliance sought a range of materials, but here it focuses on its request for "completed circuit court forms GN-3180 (CCAP), Notice of Voting Eligibility, sent to the Wisconsin Elections Commission anytime." The Alliance now claims that it seeks only NVE forms and that all the NVE forms it seeks come from guardianship proceedings.[4]

¶9 The same day the Alliance sent its second request, and before Secord responded to either request, the Alliance filed this action.[5] It seeks a writ of mandamus compelling production of the NVE forms. The circuit court denied the petition, reasoning that NVE forms were confidential under WIS. STAT. § 54.75.

¶10 This case has reached this court twice. The first time we reviewed this case, we were presented with a conflict between two court of appeals opinions involving the Alliance's request for NVE forms in separate counties. The court of appeals in this case reversed the circuit court, holding that the Alliance was entitled to the NVE forms. *See Wis. Voter All. v. Secord*, No. 2023AP36, unpublished slip op., ¶4 (Wis. Ct. App. Dec. 27, 2023) ("*Secord I*"). However, an earlier-decided, published court of appeals decision had come to the opposite conclusion. *See Wis. Voter All. v. Reynolds*, 2023 WI App 66, 410 Wis. 2d 335, 1 N.W.3d 748. The *Reynolds* court held that the Alliance was not entitled to the NVE forms, under § 54.75. *Id.*, ¶34. We reviewed the *Secord I* decision and, due to the conflict, reversed and remanded to the court of appeals with instructions to follow *Cook v. Cook*, 208 Wis. 2d 166, 560 N.W.2d 246 (1997). *See Wis. Voter All. v. Secord*, 2025 WI 2, ¶3, 414 Wis. 2d 348, 15 N.W.3d 872 ("*Secord II*").

¶11 On remand, the court of appeals held that under *Cook* it was bound by *Reynolds* to affirm the circuit court. *See Wis. Voter All. v. Secord*, No. 2023AP36, unpublished slip op., ¶3 (Wis. Ct. App. Mar. 19, 2025) ("*Secord III*"). There were two concurrences. One concurrence argued that

_____

[4] Our statutes contemplate that NVE forms can also be created upon a declaration of incompetence to vote outside of a guardianship proceeding. *See* WIS. STAT. § 54.25(2)(c)1.g., (2)(c)4.

[5] We note that, contrary to the Alliance's actions here, a requester should seek a writ of mandamus if an authority "withholds a record . . . or delays granting access to a record." *See* WIS. STAT. § 19.37(1). Nevertheless, the parties address the merits of the request and no party suggests that the timing should impede our review.

the *Reynolds* analysis was incorrect and that NVE forms are not "pertinent to the finding of incompetency" under § 54.75. *See id.*, ¶¶11–38 (Lazar, J., concurring). A second concurrence defended the *Reynolds* interpretation. *See id.*, ¶¶39–46 (Neubauer, J., concurring). Here, we review that *Secord III* decision.

## II. ANALYSIS

¶12    We must determine whether the Alliance is entitled to a writ of mandamus compelling the register in probate to release the requested NVE forms. We first lay the foundation for our analysis by outlining our public records law and the mandamus standard. We take this opportunity to clarify the mandamus standard in public records cases such as this. After establishing that foundation, we explain why the Alliance does not have a right to the NVE forms at issue here and thus is not entitled to a writ of mandamus.

### A. PUBLIC RECORDS LAW

¶13    Wisconsin law presumes open access to public records. *Osborn v. Bd. of Regents of Univ. of Wis. Sys.*, 2002 WI 83, ¶13, 254 Wis. 2d 266, 647 N.W.2d 158. Indeed, when the legislature codified our public records law, it declared a policy of open access, saying that: the public records statute "shall be construed in every instance with a presumption of complete public access"; sharing information is "an essential function of a representative government"; and "all persons are entitled to the greatest possible information regarding the affairs of government." WIS. STAT. § 19.31; § 14, ch. 335, Laws of 1981 (codifying public records law).

¶14    When an authority receives a public records request, it "shall, as soon as practicable and without delay, either fill the request or notify the requester of the authority's determination to deny the request in whole or in part and the reasons therefor." WIS. STAT. § 19.35(4)(a). To determine whether the requester is entitled to the records, the custodian must first determine whether responsive records exist. *See J. Times v. Police & Fire Comm'rs Bd.*, 2015 WI 56, ¶55, 362 Wis. 2d 577, 866 N.W.2d 563; WIS. STAT. § 19.32(2) (defining "Record"). If such records exist, the custodian next analyzes whether the records are subject to a statutory or common law exception to disclosure. *Hempel v. City of Baraboo*, 2005 WI 120, ¶28, 284 Wis. 2d 162, 699 N.W.2d 551. If no statutory or common law exception applies, a custodian considers whether the public policy balancing test

counsels toward nondisclosure. *See id.* Under that test, a custodian must determine "whether the strong presumption favoring access and disclosure is overcome by some even stronger public policy favoring limited access or nondisclosure." *Id.* If a responsive record exists, no statutory or common law exception applies, and the balancing test weighs in favor of disclosure, the requester has a legal right to the record. *See* § 19.35(1)(a) ("Except as otherwise provided by law, any requester has a right to inspect any record."); *Hathaway v. Joint Sch. Dist. No. 1, City of Green Bay*, 116 Wis. 2d 388, 404, 342 N.W.2d 682 (1984).

¶15    If an authority withholds records or delays granting access, a requester may ask a court to order release of the records via a writ of mandamus. WIS. STAT. § 19.37(1). Mandamus was the common law remedy for requesters seeking access to records, and the legislature codified that remedy in § 19.37(1). *See Beckon v. Emery*, 36 Wis. 2d 510, 518–19, 153 N.W.2d 501 (1967). We turn next to the mandamus standard in public records cases.

## B.  MANDAMUS AND PUBLIC RECORDS

¶16    Because our public records law requires enforcement through mandamus actions, our courts have a long history of considering the writ of mandamus in the public records context. WIS. STAT. § 19.37(1); *Beckon*, 36 Wis. 2d at 518–19. In this case, the parties, circuit court, and court of appeals have advanced a mandamus analysis that represents a "historical outlier." *See Secord II*, 414 Wis. 2d 348, ¶46 (Hagedorn, J., concurring). Accordingly, we take this opportunity to clarify the proper mandamus standard in a case such as this, and we adopt the approach suggested by Justice Hagedorn the last time we heard this case. *See id.*, ¶¶42–50.

¶17    A writ of mandamus is a remedy used to compel a public officer to perform a legal duty. *See State ex rel. Lewandowski v. Callaway*, 118 Wis. 2d 165, 171, 346 N.W.2d 457 (1984). In a generic mandamus action, the party seeking a writ must show four elements are met: (1) a clear legal right; (2) a positive and plain duty; (3) substantial damages; and (4) no other adequate remedy at law. *Lake Bluff Hous. Partners v. City of South Milwaukee*, 197 Wis. 2d 157, 170, 540 N.W.2d 189 (1995). Each of those four elements has been raised and analyzed in this case. However, as we explain below, our courts have historically avoided analyzing all four mandamus elements in public records cases, and our public records statute does not contemplate such an analysis.

¶18	Consequently, we clarify that in a mandamus action where a requester seeks a determination that she is entitled to records under our public records law, a court should not consider all four mandamus elements. Instead, a court should consider only whether the requester has a right to the records. To determine whether a requester has a right to the records, a court analyzes whether responsive records exist, whether statutory or common law exceptions apply, and whether the public policy balancing test weighs toward disclosure. *See supra* ¶14. Our public records statute requires nothing more.

¶19	We begin by establishing that such an analysis is historically typical in public records mandamus cases. Outside of the public records context, our cases have long analyzed each of the four mandamus elements.[6] But mandamus cases in the public records context tell a different story. Before the public records statute was enacted, courts focused on whether the custodian provided a valid legal reason to withhold a record, rather than analyzing each mandamus element. *See Newspapers, Inc. v. Breier*, 89 Wis. 2d 417, 427, 279 N.W.2d 179 (1979) ("If the custodian gives no reasons or gives insufficient reasons for withholding a public record, a writ of mandamus compelling the production of the records must issue."). Against that common law backdrop, the legislature codified the public records statute in 1981, including the mandamus remedy. § 14, ch. 335, Laws of 1981. Since then, courts have continued to tie mandamus to the requester's entitlement to the records. *Hathaway*, 116 Wis. 2d at 404 ("[W]here a request for a public record is made and no statutory exception exists, no limitations under common law exist, and no specifically stated sufficient reasons to the contrary are presented by the custodian, a writ of mandamus must issue . . . .").

---

[6] *See, e.g., Lake Bluff Hous. Partners v. City of South Milwaukee*, 197 Wis. 2d 157, 182, 540 N.W.2d 189 (1995) (determining there was no clear legal right); *L. Enf't Standards Bd. v. Vill. of Lyndon Station*, 101 Wis. 2d 472, 496, 305 N.W.2d 89 (1981) (analyzing the legal right, plain duty, and alternative remedies); *Burns v. City of Madison*, 92 Wis. 2d 232, 245–46, 284 N.W.2d 631 (1979) (concluding there were no substantial damages and saying "mandamus will not be granted where the petition has shown a completely naked legal right"); *Neu v. Voege*, 96 Wis. 489, 492–93, 71 N.W. 880 (1897) (naming and applying the elements).

¶20 Most public records mandamus cases never mention the mandamus elements, and those that do almost never turn on anything beyond the right to the records. Typically, courts in public records mandamus cases do not identify the mandamus elements.[7] This includes cases where the court decided records should be released and thus would logically need to address all four elements, were they required.[8] And even where courts do mention the mandamus elements, almost all cases hinge on the requester's right to the records.[9] In short, since the enactment of our public records statute, "Wisconsin courts have continued to concentrate their analysis on the simple question of whether the requester had a right to the records or not." *Secord II*, 414 Wis. 2d 348, ¶45 (Hagedorn, J., concurring).

---

[7] *See, e.g.*, *Democratic Party of Wis. v. DOJ*, 2016 WI 100, 372 Wis. 2d 460, 888 N.W.2d 584; *Milwaukee J. Sentinel v. DOA*, 2009 WI 79, 319 Wis. 2d 439, 768 N.W.2d 700; *Osborn v. Bd. of Regents of Univ. of Wis. Sys.*, 2002 WI 83, 254 Wis. 2d 266, 647 N.W.2d 158; *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Erpenbach*, 2014 WI App 49, 354 Wis. 2d 61, 848 N.W.2d 862; *State ex rel. Blum v. Bd. of Educ., Sch. Dist. of Johnson Creek*, 209 Wis. 2d 377, 565 N.W.2d 140 (Ct. App. 1997). In one case, the elements were cited but never analyzed. *See Voces De La Frontera, Inc. v. Clarke*, 2017 WI 16, ¶11, 373 Wis. 2d 348, 891 N.W.2d 803.

[8] *See Milwaukee J. Sentinel*, 319 Wis. 2d 439, ¶66; *Juneau Cnty. Star-Times v. Juneau County*, 2013 WI 4, ¶84, 345 Wis. 2d 122, 824 N.W.2d 457; *MacIver Inst.*, 354 Wis. 2d 61, ¶33.

[9] *See Watton v. Hegerty*, 2008 WI 74, ¶27 & n.17, 311 Wis. 2d 52, 751 N.W.2d 369 (holding that the requester did not show he had a clear legal right and declining to address the other elements); *Wis. Voter All. v. Reynolds*, 2023 WI App 66, ¶20, 410 Wis. 2d 335, 1 N.W.3d 748; *State ex rel. Ardell v. Milwaukee Bd. of Sch. Dirs.*, 2014 WI App 66, ¶14, 354 Wis. 2d 471, 849 N.W.2d 894; *State ex rel. Greer v. Stahowiak*, 2005 WI App 219, ¶15, 287 Wis. 2d 795, 706 N.W.2d 161. Two of those cases and a third, separate case say that the requester fails on the second element—plain legal duty. *Reynolds*, 410 Wis. 2d 335, ¶20; *Ardell*, 354 Wis. 2d 471, ¶14; *State ex rel. Morke v. Rec. Custodian, DHSS*, 154 Wis. 2d 727, 730–31, 454 N.W.2d 21 (Ct. App. 1990). Those three cases fit the historical pattern because the first and second elements are two sides of the same coin, *see infra* ¶23, and all three cases root their analysis of the second element in whether the requester was entitled to the records under public records law. *Reynolds*, 410 Wis. 2d 335, ¶20; *Ardell*, 354 Wis. 2d 471, ¶14; *Morke*, 154 Wis. 2d at 733–34.

¶21 Indeed, courts reach beyond the requester's right to the record only in anomalous situations. The court of appeals' first decision in this case is one such anomaly. There, the court analyzed each mandamus element and held that the Alliance "met all prerequisites for its petition for a writ of mandamus." *Secord I*, No. 2023AP36, ¶¶31–34. The court determined that: there was a clear legal right and plain duty because a statute contemplated creation of the underlying records; there were substantial damages to the public due to the impact on elections; and there was no other adequate remedy at law because no other actor must audit local voter rolls searching for people found incompetent to vote. *Id.*, ¶¶31–33. In a second anomaly, a 1988 court of appeals case determined that the requester had an alternative adequate remedy because the requester had already received the requested records through a writ of certiorari. *State ex rel. Morke v. Wis. Parole Bd.*, 148 Wis. 2d 250, 253, 434 N.W.2d 824 (Ct. App. 1988). In both cases, the courts stepped out of the typical analysis and considered factors not contemplated under our public records statute. As we explain next, courts should avoid that pitfall.

¶22 Courts should consider only the right to the records because our statute does not require analyzing the last three mandamus elements, and analyzing them risks undermining public records law. *See Secord II*, 414 Wis. 2d 348, ¶¶46–49 (Hagedorn, J., concurring). As we have established, in examining the first mandamus element—clear legal right— a court conducts the typical public records analysis to determine whether the requester has a right to the records. Our public records statute is satisfied at this step: "Except as otherwise provided by law, any requester has a right to inspect any record" and mandamus is the remedy. WIS. STAT. §§ 19.35(1)(a), 19.37(1). Moreover, our standard public records analysis, situated under the first mandamus element, carefully balances the public's right to access records against privacy and confidentiality interests protected by our exceptions and balancing test. Analyzing the last three elements could only disrupt the delicate balance struck under the first.

¶23 A court need not analyze the second mandamus element— positive and plain duty—because under our public records statute, the second element collapses into the first. If a requester has a clear legal right to records, then the authority has a plain duty to release them. Indeed, our statute directs authorities to respond to record requests using the mandatory language "shall." WIS. STAT. § 19.35(4)(a); *see ECO, Inc. v. City of Elkhorn*, 2002 WI App 302, ¶24, 259 Wis. 2d 276, 655 N.W.2d 510 (saying § 19.35(4)(a) imposes "a duty"); *Karow v. Milwaukee Cnty. Civ. Serv.*

*Comm'n*, 82 Wis. 2d 565, 570, 263 N.W.2d 214 (1978) ("'[S]hall' is presumed mandatory when it appears in a statute.").

¶24    Similarly, our statute does not contemplate analysis of the third mandamus element—substantial damages. "Nowhere does the public records law condition a requester's right to receive records on a particular showing of damages, nor does the statute countenance an inquiry into motives or the public good that may be served or harmed by release of records." *Secord II*, 414 Wis. 2d 348, ¶48 (Hagedorn, J., concurring). Indeed, typical requesters need not disclose the purpose of their request, and our courts have said the "purpose of the requester of public records is not a part of the balancing test." WIS. STAT. § 19.35(1)(i); *Levin v. Bd. of Regents of Univ. of Wis. Sys.*, 2003 WI App 181, ¶14, 266 Wis. 2d 481, 668 N.W.2d 779. It would undermine our public records law, then, for a court to analyze the third element and consider how a specific requester may be harmed by their inability to use records for their intended purpose or whether there would be harms to anyone other than the requester. *Contra Secord I*, No. 2023AP36, ¶32.

¶25    The fourth mandamus element—no other adequate remedy at law—also need not be analyzed under our public records statute. A writ of mandamus is the statutorily mandated remedy for a requester seeking access to records. *See* WIS. STAT. § 19.37(1). Nothing in our public records statute suggests that a requester must seek records in another way before seeking mandamus. As such, a requester seeking a writ of mandamus is following our statute and should not be denied for failing to pursue an alternative route. If a court considered this element independently, it could give undue weight to a requester's ability to receive records through another mechanism. *Contra Morke*, 148 Wis. 2d at 253.[10]

¶26    Thus, we clarify that under our public records statute, in a mandamus action where a requester seeks a determination that she is entitled to records, the only relevant inquiry is whether the requester has a right to the records.

---

[10] To the extent *Morke* stands for the proposition that the fourth mandamus element should be analyzed in a public records case such as this, we overrule it. *See State ex rel. Morke v. Wis. Parole Bd.*, 148 Wis. 2d 250, 253, 434 N.W.2d 824 (Ct. App. 1988).

### C.  STANDARD OF REVIEW

¶27     Here, we must determine whether the Alliance has a right to the requested records. Whether a requester has a legal right to records is a question of law that we review de novo. *See Watton v. Hegerty*, 2008 WI 74, ¶6, 311 Wis. 2d 52, 751 N.W.2d 369 (de novo review for applying public records law to facts); *Democratic Party of Wis. v. DOJ*, 2016 WI 100, ¶9, 372 Wis. 2d 460, 888 N.W.2d 584 (de novo review for the public policy balancing test).

¶28     We note that our cases sometimes state that we review mandamus decisions for an erroneous exercise of discretion. *See, e.g.*, *Watton*, 311 Wis. 2d 52, ¶6; *L. Enf't Standards Bd. v. Vill. of Lyndon Station*, 101 Wis. 2d 472, 493–94, 305 N.W.2d 89 (1981). But as we explained above, a court reviewing a mandamus decision in the public records context should focus on only the requester's right to the records—a legal question. Thus, we clarify that in a mandamus action where a requester seeks a determination that she is entitled to records under our public records law, an appellate court conducts de novo review of that determination, not review for erroneous exercise of discretion.

### D.  APPLICATION TO NOTICE OF VOTING ELIGIBILITY FORMS

¶29     Having established the relevant standards, we now consider whether the Alliance has a right to the NVE forms under our public records law. Secord argues that the NVE forms are not subject to disclosure. She maintains that a statutory exception to disclosure applies because, under WIS. STAT. § 54.75, the NVE forms are "pertinent to the finding of incompetency" and therefore "closed." Alternatively, she suggests that the records must be withheld under the balancing test. The Alliance argues that it should receive the NVE forms. It contends that § 54.75 is not a barrier to release because the NVE forms are not "pertinent to the finding of incompetency." That is so, the Alliance argues, because the NVE forms are created after the finding of incompetency and are a consequence of the finding. It also argues that disclosure should be allowed under the public policy balancing test.

¶30     We conclude that the Alliance does not have a legal right to the NVE forms requested here because those records are "closed" under WIS. STAT. § 54.75. Thus, a statutory exception to disclosure applies. *See* WIS. STAT. § 19.36(1) ("Any record which is specifically exempted from

disclosure by state or federal law . . . is exempt from disclosure under" our public records statute).[11]

¶31    In reaching this conclusion, we interpret § 54.75. When interpreting statutes, we consider "the statutory text at issue, related statutes and phrases, a statute's place within the statutory structure, its stated or textually manifest purpose, and statutory history." *Serv. Emps. Int'l Union Healthcare Wis. v. WERC*, 2025 WI 29, ¶8, 416 Wis. 2d 688, 22 N.W.3d 876.

¶32    We begin with the text of § 54.75:

> **Access to court records.** All court records pertinent to the finding of incompetency are closed but subject to access as provided in s. 51.30 or 55.22 or under an order of a court under this chapter. The fact that an individual has been found incompetent and the name of and contact information for the guardian is accessible to any person who demonstrates to the custodian of the records a need for that information.

In short, this provision says that court records "pertinent to the finding of incompetency" are "closed," subject to some exceptions. *Id.*

¶33    On its face, this provision protects court records in chapter 54 cases. It says that "court records" are "closed." *Id.* Thus, the legislature communicated its intention to keep some chapter 54 records private. The question here is whether NVE forms are such records.

¶34    As an initial matter, we note that the Alliance does not argue that it may access the NVE forms under any of the exceptions in the first sentence of § 54.75. Further, we conclude that the forms are not subject to disclosure under the second sentence of § 54.75. The Alliance appears to argue that the NVE forms should be released under that second sentence because it has a "need" for the forms. But even if the Alliance had demonstrated "a need," it would be entitled to access only the "fact that

---

[11] Because we conclude that a statutory exception applies, we need not consider the public policy balancing test. *See Hempel v. City of Baraboo*, 2005 WI 120, ¶28, 284 Wis. 2d 162, 699 N.W.2d 551.

an individual has been found incompetent and the name of and contact information for the guardian," not NVE forms. *See* § 54.75. Accordingly, we focus on the remainder of § 54.75 and consider whether NVE forms fall under the legislature's directive that court records "pertinent to the finding of incompetency" are closed. *Id.*

¶35 We first consider the word "pertinent." The parties provide definitions from two dictionaries. One dictionary defines "pertinent" as "having some connection with the matter at hand; relevant; to the point." *Pertinent*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1075 (4th ed. 2001). The parties also present definitions from two different versions of Black's Law Dictionary: "[p]ertaining to the issue at hand; relevant," *Pertinent*, BLACK'S LAW DICTIONARY 1181 (8th ed. 2004); and "[o]f, relating to, or involving the particular issue at hand; relevant," *Pertinent*, BLACK'S LAW DICTIONARY (12th ed. 2024).

¶36 The statute connects the word "pertinent" with "the finding of incompetency." § 54.75. In chapter 54, "the finding of incompetency" is the court's general finding that a person is incompetent such that a guardian may be appointed. *See* WIS. STAT. § 54.10(3); *see also* WIS. STAT. § 54.01(16) (defining "Individual found incompetent" by referencing § 54.10(3)). That incompetency finding is a central part of a guardianship proceeding. *See* WIS. STAT. § 54.46(1)(a), (2) (indicating that a case's disposition turns on the finding of incompetency).

¶37 Combining these definitions, we must determine whether NVE forms "hav[e] some connection" to, have "relevan[ce]" to, or "relat[e] to" the central incompetence finding in a guardianship proceeding. We conclude that they do.

¶38 The NVE forms document a finding of voter eligibility that is procedurally and substantively intertwined with the "finding of incompetency." Procedurally, the two findings are made in the same hearing. Our statutes say that a court makes the voter-eligibility finding "as part of a proceeding under s. 54.44" in which the finding of incompetency is made. WIS. STAT. § 54.25(2)(c)1. Substantively, both findings require analyzing a person's mental capacity and thus may be based on similar evidence. *See* §§ 54.10(3), 54.25(2)(c)1.g. The statutes refer to both as findings of incompetence. *See* §§ 54.10(3), 54.25(2)(c).

¶39 The NVE forms are connected to the "finding of incompetency" because they communicate that closely-related voter-

eligibility finding. In fact, our statutes require such communication. Once the voter-eligibility finding is made, a court "shall" communicate the finding "in writing." § 54.25(2)(c)1.g. And the content of the forms relates to the incompetency finding. The forms contain the case caption for the guardianship proceeding and the case number, including the "GN" case designation. They indicate that "the circuit court declared" that the person "is not competent to exercise the right to register to vote or to vote in an election," which is the finding made "as part of" the chapter 54 proceeding. *See* § 54.25(2)(c)1. Alternatively, the forms may communicate that a person's right to vote "has been restored," which is likewise declared as part of a chapter 54 proceeding. *See* § 54.25(2)(c)1.g. In short, the "finding of incompetency" is central to a guardianship case and the NVE forms are created as a part of that case, reference that case, and document a closely-related finding from that case. The forms are thus "pertinent to the finding of incompetency."

¶40 The statutory context bolsters our conclusion that the NVE forms are "closed" under § 54.75, because surrounding statutes evince the legislature's desire to keep chapter 54 proceedings confidential. In chapter 54, the legislature created a procedure with "closed" hearings and "closed" records. WIS. STAT. §§ 54.44(5), 54.75. Every hearing under chapter 54 "shall be closed" such that "only interested persons, their attorneys, and witnesses may be present." § 54.44(5). That provision would ring hollow if the fruits of those proceedings, like NVE forms, were available through public records requests.

¶41 Similarly, many records are "closed" under § 54.75, and the surrounding provisions demonstrate the breadth of the rule. The second sentence of § 54.75 says that a person who demonstrates "a need" may access two pieces of information. First, the person may access "the name of and contact information for the guardian." Thus, even in cases of proven need, a person could access contact information for only the guardian, not the individual found incompetent. Given that the contact information of the individual should be kept confidential, it would make little sense if the neighboring sentence of § 54.75 allowed any public records requester to access an NVE form with the individual's name and date of birth, and perhaps the individual's address. Second, and even more revealing, a person who demonstrates "a need" may access "[t]he fact that an individual has been found incompetent." Thus, the legislature contemplated that even *the fact* that a person was found incompetent should be protected. We will not interpret the preceding sentence of

§ 54.75 to allow any public records requester access to a form that gives away that very fact.

¶42　In conflict with this context, the Alliance offers a narrow interpretation of § 54.75. It argues that the NVE forms are not "pertinent to the finding of incompetency" because they are created after the finding and are a consequence of the finding of incompetency. We decline to read § 54.75 so narrowly. We agree with the *Reynolds* court that "[m]any court records that are pertinent to a court's decision—such as court forms, written opinions, and transcripts of proceedings in which decisions are made—are created after the court has made a decision." 410 Wis. 2d 335, ¶26. Thus, a court record may be "pertinent" to the finding even if it is created after the finding. And more fundamentally, the Alliance's interpretation cannot be squared with the legislature's enacted preference for confidentiality in these proceedings. Under the Alliance's interpretation, there would be no public records statutory exception for NVE forms, despite the legislature's efforts to ensure that guardianship proceedings, the identifying information of individuals found incompetent, and even the fact of their incompetency remain private. *See* §§ 54.44(5), 54.75. And the disconnect would not stop with NVE forms. We wonder, for instance, whether under the Alliance's interpretation, the GN-3170 forms that document the general finding of incompetency and contain abundant detail about the guardianship appointment might also be a consequence of the finding created after the fact and therefore not subject to protection under § 54.75.[12]

---

[12] In support of its interpretation, the Alliance points to an attorney general opinion that interpreted a predecessor to WIS. STAT. § 54.75. *See* 67 WIS. OP. ATT'Y GEN. 130 (1978) (OAG 31-78) (interpreting WIS. STAT. § 880.33(6) (1975–76)). The attorney general opined that an index of proposed wards and a docket listing filed documents were not "closed" under the statute and that "only the file containing the documents themselves are 'records pertinent to the finding of incompetency.'" *Id.* at 131. But that opinion is "not binding authority on this court." *Kocken v. Wisc. Council 40, AFSCME, AFL-CIO*, 2007 WI 72, ¶51 n.34, 301 Wis. 2d 266, 732 N.W.2d 828. It also interpreted an earlier version of the statute without the modern statutory context. *See* § 880.33(6) (1975–76) (not containing the need-based provision in the second sentence of the modern statute). Moreover, the opinion did not address NVE forms and it is unclear why the Alliance says that NVE forms should be treated like an index or docket instead of the guardianship "documents themselves."

¶43 The Alliance also argues that NVE forms cannot be "pertinent to the finding of incompetency" because they are used outside of guardianship proceedings. Specifically, it asserts that the forms are sent to WEC, which uses the forms to populate voter-eligibility data on a public-facing website. It also asserts that these forms can be used during challenges to a voter's eligibility under WIS. STAT. § 6.48. These arguments are beside the point of our statutory analysis, because considering what other state entities may do with these forms does not change whether the forms are "pertinent to the finding of incompetency" under § 54.75. To the extent the Alliance argues that it should receive the forms regardless of § 54.75 due to WEC's actions, we reject its argument for two reasons. First, the Alliance's argument does not explain why NVE forms should be released, because no one alleges that WEC makes NVE forms themselves public. Second, the Alliance requested the forms from a register in probate, who holds the forms as "court records" protected under § 54.75. *See* WIS. STAT. § 851.72(1), (2) (requiring registers in probate to keep "a court record" of chapter 54 cases). And the confidentiality of an NVE form held by a register in probate "is not affected by WEC's treatment of a duplicate of that same form." *Reynolds*, 410 Wis. 2d 335, ¶32.

¶44 Finally, the Alliance suggests that the NVE forms it seeks are subject to disclosure because some NVE forms may be created outside of a guardianship proceeding. *See* WIS. STAT. § 54.25(2)(c)1.g., (2)(c)4. (contemplating chapter 54 procedures "limited to a determination as to voting eligibility"). However, the Alliance acknowledged at oral argument that all the NVE forms it requests here come from guardianship proceedings. Thus, we need not determine whether NVE forms created through that separate chapter 54 procedure would be subject to disclosure.[13]

---

[13] The day before oral argument, the Alliance filed a notice of supplemental authority. The only authority referenced therein was a per curiam court of appeals opinion, *Burnett County v. T.W.Z.*, No. 2024AP2024, unpublished slip op. (Wis. Ct. App. Feb. 3, 2026) (per curiam). Per curiam opinions "may not be cited in any court of this state as precedent or authority," except for limited uses not applicable here. WIS. STAT. § (Rule) 809.23(3)(a); *see also* § (Rule) 809.23(3)(b) (excluding per curiam opinions from cases that may be cited for persuasive value). Accordingly, we do not consider the Alliance's supplemental authority.

### III.  CONCLUSION

¶45    Our task is to determine whether the Alliance has a right to access the NVE forms it requested under our public records law. We conclude that those NVE forms are "court records pertinent to the finding of incompetency" and are therefore "closed" under WIS. STAT. § 54.75. Thus, the forms are subject to a statutory exception under public records law, the Alliance has no right to the records, and the writ of mandamus shall not issue.

*By the Court.*—The decision of the court of appeals is affirmed.

## I. INTRODUCTION

¶46    A court cannot use a document to make a finding if the document does not exist at the time the finding is made. Before a court may revoke an individual's right to vote, it must find, by clear and convincing evidence, that the individual is "incapable of understanding the objective of the elective process." WIS. STAT. § 54.25(2)(c)1.g. Any determination that one has lost the right to vote is separate and distinct from a finding that "because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety" rendering the individual incompetent and in need of a guardian. WIS. STAT. § 54.10(3)(a)2. The findings a court makes for incompetency differ from findings made, and what must be proven, for one to lose the right to vote. And, the right to vote is not always at issue in an incompetency determination. A right-to-vote determination, if pursued, either occurs after the individual has been found incompetent under § 54.25(2)(c)1g. or in a standalone action under § 54.25(2)(c)4.

¶47    To be sure, a Notice of Voting Eligibility form ("NVE") could not inform a finding of incompetency, as it does not exist when that finding is made. Instead, it is a communication of a finding that the individual is "incapable of understanding the objective of the elective process," not a finding of incompetency, that prompts the creation of an NVE. The form's sole purpose is to communicate to the Wisconsin Elections Commission ("WEC") that an individual has lost the right to vote, so that the individual is removed from the voter rolls. A finding of incompetency may or may not precede a determination that one has lost the right to vote, but one thing is clear: NVEs cannot be pertinent to the finding of incompetency because they do not exist before an incompetency determination is made.

¶48    And, the legislature specifically provided for the release of NVEs into the public domain. In fact, it mandated their dissemination by obligating the circuit court to transmit information to the WEC pertaining to findings that "an individual is incapable of understanding the objective of the elective process." The legislature has demonstrated that it knows

how to both shield and disseminate information. While the legislature protected court records pertinent to the "finding of incompetency," it did the opposite regarding NVEs. The majority's conclusion fails to recognize this important distinction: A finding of incompetency is distinct from a finding that one has lost the right to vote. Instead, it adopts an overbroad and unworkable definition of what records pertain to a finding of incompetency to include NVEs. Holding that NVEs are shielded from the public records law runs counter to the statute's language, scheme, and the presumption of open government.

¶49    At issue in this case is whether NVEs are "pertinent to the finding of incompetency" under WIS. STAT. § 54.75. The majority says they are. I disagree. I dissent because, unlike the majority's determination that these forms are shielded from this public records request, I conclude that NVEs cannot be pertinent to the finding of incompetency and should be released to the requestor.

## II.  DISCUSSION

¶50    Interpreting whether NVEs are "court records pertinent to the finding of incompetency" under WIS. STAT. § 54.75 requires us to employ our longstanding tools of statutory construction. Statutory interpretation seeks to ascertain the plain meaning of the statute's enacted language. *Serv. Emps. Int'l Union Healthcare Wis. ("SEIUHW") v. WERC*, 2025 WI 29, ¶7, 416 Wis. 2d 688, 22 N.W.3d 876. Thus, our analysis focuses on the statute's text to determine its objective meaning. *See State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110 (focusing on "the enacted law, not the unenacted intent" to "determine what the statute means so that it may be given its full, proper, and intended effect"). Often, statutory interpretation starts and ends with the text. When the meaning of the statute is plain, our job is done. *Id.*, ¶45. By focusing on the statute's text, we can glean the legislature's intent based on what language was actually codified. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (presuming "that a legislature says in a statute what it means and means in a statute what it says there").

### THE TEXT OF WIS. STAT. § 54.75.

¶51    Our analysis begins with the statute's text. *See Kalal*, 271 Wis. 2d 633, ¶45. WISCONSIN STAT. § 54.75 closes "[a]ll court records

pertinent to the finding of incompetency." WIS. STAT. § 54.75.[1] The words chosen by the legislature are vital. *Wis. Just. Initiative, Inc. v. WEC*, 2023 WI 38, ¶19, 407 Wis. 2d 87, 990 N.W.2d 122. Generally, we give words their "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Kalal*, 271 Wis. 2d 633, ¶45 (citing *Bruno v. Milwaukee County*, 2003 WI 28, ¶¶8, 20, 260 Wis. 2d 633, 660 N.W.2d 656).

*1. "Pertinent"*

¶52    The legislature did not define "pertinent" in WIS. STAT. § 54.75. And the two cases that have interpreted the phrase disagreed on its meaning. The court of appeals in *Wisconsin Voter Alliance v. Reynolds* read "pertinent" broadly to include all records peripheral to the chapter 54 incompetency hearing. *See Wis. Voter All. v. Reynolds*, 2023 WI App 66, ¶28, 410 Wis. 2d 335, 1 N.W.3d 748 (determining NVEs are pertinent "because they are created in the context of proceedings in which incompetency is determined for purposes of establishing guardianship"). Alternatively, the *Secord* court offered a more "circumscribed" reading of "pertinent" combined with the rest of the phrase "to the finding of incompetency" to limit the phrase to "[o]nly . . . documents and information that lead up to and are utilized in deliberations." *See Wis. Voter All. v. Secord*, No. 2023AP36, unpublished slip op., ¶¶56–57 (Wis. Ct. App. Dec. 27, 2023) (Lazar, J., concurring) (discussing *Reynolds*, 410 Wis. 2d 335), *rev'd and remanded*, 2025 WI 2, 414 Wis. 2d 348, 15 N.W.3d 872).

¶53    To understand a word's common, ordinary, and accepted meaning, dictionary definitions can be useful. *Stroede v. Soc'y Ins.*, 2021 WI

---

[1]The entire statute states:

> All court records *pertinent to the finding of incompetency* are closed but subject to access as provided in [WIS. STAT. §§] 51.30 or 55.22 or under an order of a court under this chapter. The fact that an individual has been found incompetent and the name of and contact information for the guardian is accessible to any person who demonstrates to the custodian of the records a need for that information.

WIS. STAT. § 54.75 (emphasis added).

43, ¶12, 397 Wis. 2d 17, 959 N.W.2d 305 (citing *Noffke ex rel. Swenson v. Bakke*, 2009 WI 10, ¶10, 315 Wis. 2d 350, 760 N.W.2d 156). When the statute was passed in 1973, "pertinent" meant "applicable; relevant. Evidence is called 'pertinent': when it is directed to the issue of matters in dispute, and legitimately tends to prove the allegations of the party offering it; otherwise it is called 'impertinent.'" *Pertinent*, BLACK'S LAW DICTIONARY (4th ed. 1968).

¶54    If the definition of pertinent were the end of our inquiry, "pertinent" may appear to refer to any court record tangential to a WIS. STAT. ch. 54 ward's incompetency determination. But words do not function solitarily; the sentence as a whole must be considered. *Kalal*, 271 Wis. 2d 633, ¶46 (invoking the Whole-Text canon). The legislature used "pertinent" in relation to a "finding of incompetency."

¶55    The relevant statutory phrase is "court records pertinent *to the finding of incompetency.*" WIS. STAT. § 54.75 (emphasis added). Thus, we must consider what records are pertinent to the finding of incompetency.

*2. Finding of Incompetency vs. Incapacity to Vote.*

¶56    To start, in chapter 54, there is a statutory difference between a finding of incompetency for guardianship of the person and a declaration that one has lost the right to vote. The latter may occur with or without an incompetency determination, and each has a unique legal standard which requires specific findings. WISCONSIN STAT. § 54.25(2)(c)4. is a standalone provision that addresses how one may lose the right to vote outside of the guardianship incompetency context. It states:

> Regardless of whether a guardian is appointed, a court may declare that an individual is not competent to exercise the right to register to vote or to vote in an election if it finds by clear and convincing evidence that the individual is incapable of understanding the objective of the elective process.

WIS. STAT. § 54.25(2)(c)4.

¶57    Separately, a court may consider whether one may exercise the right to vote after a guardianship incompetency determination is considered. But, the right to vote is a separate determination. First, to conclude that a person is incompetent and in need of a guardian of their

4

person, the court must find the individual "unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety." WIS. STAT. § 54.10(3)(a)2. Second, if the right to vote is being challenged, the court must separately find whether the person is "incapable of understanding the objective of the elective process." WIS. STAT. § 54.25(2)(c)1.g. Finding an individual incompetent and in need of a guardian of their person requires the court to make factual conclusions based on the evidence presented to the requisite standard. *See* WIS. STAT. § 805.17(2) (requiring a court "[i]n all actions tried upon the facts without a jury" to "find the ultimate facts and state separately its conclusions of law"). Finding one is incompetent to vote is a separate determination with a different standard. It does not even have to implicate the incompetency hearing. *See* § 54.25(2)(c)1.g. ("Also, in accordance with [WIS. STAT. §] 6.03(3), any elector of a municipality may petition the circuit court for a determination that an individual residing in the municipality is incapable of understanding the objective of the elective process and thereby ineligible to register to vote or to vote in an election. This determination shall be made by the court in accordance with the procedures specified in this paragraph. If a petition is filed under this subd. 1.g., the finding of the court shall be limited to a determination as to voting eligibility.").

¶58 Simply stated, the statutes provide that even without being adjudged incompetent, "a court may declare that an individual is not competent to exercise the right to register to vote or to vote in an election if it finds by clear and convincing evidence that the individual is incapable of understanding the objective of the elective process." WIS. STAT. § 54.25(2)(c)4. And, an individual who has been found incompetent does not automatically lose the right to vote. § 54.25(2)(b)7. The right to vote determination requires evidence that supports a separate, different finding than the one of incompetency for guardianship purposes. In either event, before revoking an individual's right to vote, the circuit court must find that the individual is "incapable of understanding the objective of the elective process." § 54.25(2)(c)1.g. It is only after this voting rights finding occurs that the legislature requires that a communication (NVE) be produced and forwarded to the WEC to notify it that the individual has lost the right to vote. The WEC is then to remove the individual from the voter rolls.

¶59 WISCONSIN STAT. ch. 54's statutory scheme clearly and repeatedly outlines how a guardianship incompetency determination is

separate from and different than a determination that one loses the right to vote. Accordingly, the "finding of incompetency," in a guardianship context, is distinct from "find[ing] that the individual is incapable of understanding the objective of the elective process."

¶60    The plain meaning of WIS. STAT. § 54.75's command to close "all court records pertinent to the finding of incompetency," closes those records that the circuit court judge used to find that an individual was incompetent for guardianship purposes. But no such prohibition statutorily exists regarding the separate voting rights determination under WIS. STAT. § 54.25(2)(c)1.g. or (2)(c)4.

¶61    And, the statute's plain meaning is further confirmed by the Attorney General's longstanding interpretation. The Attorney General— responsible for enforcing the state's laws—interpreted the statute the exact same way when it was first promulgated in 1973. Specifically, Wisconsin's Attorney General concluded that "only the file containing the documents themselves are 'records pertinent to the finding of incompetency'" because it provides "information which the court *uses* to" determine someone is incompetent. 67 WIS. OP. ATT'Y GEN. 130, 131 (1978) (OAG 31-78) (emphasis added).

¶62    The legislature could have chosen different, broader language to close every court record related to a chapter 54 guardianship proceeding like it has in chapters 51 and 55. *See* WIS. STAT. § 51.30(3)(a) ("[T]he files and records *of the court proceedings* under this chapter shall be closed but shall be accessible to any individual who is the subject of a petition filed under this chapter." (emphasis added)); WIS. STAT. § 55.22(1) ("No records of the court pertaining to protective services or protective placement *proceedings*, including evaluations, reviews and recommendations prepared under [WIS. STAT. §] 55.11(1)(c), are open to public inspection . . . ." (emphasis added)). Yet, it did not. *See State v. Trongeau*, 135 Wis. 2d 188, 192, 400 N.W.2d 12 (Ct. App. 1986) (presuming that the legislature acts with full knowledge of the law). That legislative choice demonstrates a tighter nexus—materials that are part of, or directly tied to, the adjudicative process. The original interpretation of the phrase should remain consistent. *See* WIS. STAT. § 990.001(7) ("A revised statute is to be understood in the same sense as the original unless the change in language indicates a different meaning so clearly as to preclude judicial construction.").

¶63    In sum, the language of the relevant statutes demonstrates that the legislature intended to close the court record pertinent to the finding of incompetency, but did no such thing with respect to the distinct findings required when considering the right to vote. WIS. STAT. § 54.25(2)(c)1.g. and (2)(c)4.

¶64    Accordingly, the phrase "pertinent to the finding of incompetency" indicates that the pertinent court records have some bearing on the "finding of incompetency." That excludes NVEs. In fact, NVEs are produced only after a finding under WIS. STAT. § 54.25(2)(c)1.g. The forms cannot possibly relate to the "finding of incompetency"—they are after-the-fact communications related to removing one's right to vote. Majority op., ¶¶1, 5, 6, 39. And that standard differs from findings of incompetency. Even when an individual is found to be incompetent, a court may or may not be called upon to determine if the ward is "incapable of understanding the objective of the elective process." If and when such a determination is separately found, then NVEs are created to notify the WEC that the ward has lost the right to vote. But, the NVEs do not bear on the court's separate, earlier finding of incompetency. And, as the NVE does not exist at the time of the incompetency finding, it could not be a court record pertinent to the finding of incompetency. Instead, an NVE is generated only after the incompetency finding is made and in response to the separate question of the right to vote.

¶65    And an NVE serves a legislatively created function: informing and implementing removal from voter rolls. The legislature contemplated that these documents would not be privileged by the language used. This distinct determination, unlike a finding of incompetency, is meant to be communicated. *See* WIS. STAT. § 54.25(2)(c)1.g. ("The determination of the court shall be communicated in writing by the clerk of court to the election official or agency charged under [WIS. STAT. §§] 6.48, 6.92, 6.925, 6.93, or 7.52(5) with the responsibility for determining challenges to registration and voting that may be directed against that elector."). NVEs are after-the-fact communications that cannot "'relate to' the central incompetence finding in a guardianship proceeding" because they do not exist when the finding is made. Majority op., ¶37. The legislature did not provide the cloak of confidentiality that exists for the finding of incompetency, when it spoke regarding an individual who has lost the right to vote. And, how practical would that be? A court has concluded that a person cannot vote, but no one can know of or enforce it? Of course, the legislature recognized the difference between a determination of incompetency and a separate

determination regarding voting rights when it shielded one and intended for the other to be communicated.

## III.  WRIT OF MANDAMUS

¶66     Having resolved that administrative communications are not "pertinent to the finding of incompetency," we now must answer whether the Wisconsin Voter Alliance has a right to the NVEs under the public records law. Majority op., ¶¶29–30. I conclude that they do. Having explained that the NVEs themselves are not pertinent to a finding of incompetency, Secord's position that WIS. STAT. § 54.75 exempts NVEs from disclosure is unfounded. Secord also argues that NVEs are not subject to release because public policy interests favoring nondisclosure outweigh the presumption of openness in the public records law. Secord opines that disclosure would undermine public confidence in the confidentiality of guardianship proceedings and could expose wards to exploitation or abuse, or trample on their personal-privacy interests. Secord warns of the chilling effect that an adverse ruling would have on guardianship proceedings. She is wrong for at least two reasons.

¶67     First, the public interest in disclosure is both explicit and substantial. The public records law declares that "a representative government is dependent upon an informed electorate" and that the public is entitled to the "greatest possible information regarding the affairs of government." WIS. STAT. § 19.31. That policy carries particular force here, where the records at issue bear directly on everyone's voting rights and its administration. Undoubtedly, the public has a significant interest in ensuring that only those legally qualified to vote participate in elections.[2] Improper ballots not only raise concerns of individual exploitation but also implicate the integrity of the electoral process as a whole.

---

[2] *See, e.g., Madison Tchrs., Inc. v. Scott*, 2018 WI 11, ¶37, 379 Wis. 2d 439, 906 N.W.2d 436 ("The public has a significant interest in fair elections, where votes are freely cast without voter intimidation or coercion."); *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440, 498, 51 N.W. 724 (1892) ("[T]he right of suffrage shall be guarded, protected, and secured against force and against fraud; . . . that its exercise shall be prescribed by previous law,—that every man entitled to vote may vote; that his vote may be sent forward and counted, so that he may exercise *his part* of sovereignty in common with his fellow–citizens.").

¶68     Second, Secord warns that there could be harm to those subject to the NVE communication. But that assertion is speculative at best, and fails to demonstrate how disclosing the requested records concretely impairs the integrity in maintaining the integrity of guardianship proceedings. Especially, since NVEs do not necessarily correlate with an incompetency determination and can exist outside of such a guardianship proceeding. WIS. STAT. § 54.25(2)(c)4. The NVEs simply have no bearing on an individual's incompetency and are in fact created without any indication of whether one was found incompetent and in need of a guardian, or not.

¶69     Stated simply, public disclosure is the rule; nondisclosure is the exception. WIS. STAT. § 19.31. If a requestor has a clear legal right to those records, then the custodian must release them. WIS. STAT. § 19.35(4)(a). Wisconsin's public records law recognizes the imperative nature of open government and declares that sections "19.32 to 19.37 shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business." § 19.31. The legislature's choice word "shall" makes disclosure mandatory. *Karow v. Milwaukee Cnty. Civil Serv. Comm'n*, 82 Wis. 2d 565, 570, 263 N.W.2d 214 (1978). "[O]nly in an exceptional case may access" to public records be denied. § 19.31. We do not have that here.

¶70     For all the foregoing reasons, I respectfully dissent.